STATE OF NEW MEXICO, et al.

v.

James D. WATKINS, Secretary,
Department of Energy, et
al., Appellants.

STATE OF NEW MEXICO, ex rel. Tom
UDALL, Attorney General

v.

James D. WATKINS, Secretary,
Department of Energy, et
al., Appellants.

ENVIRONMENTAL DEFENSE
FUND, et al.

v.

James D. WATKINS, Secretary,
Department of Energy, et
al., Appellants.

Nos. 91–5387, 92–5044 and 92–5045.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 15, 1992.

Decided July 10, 1992.

John A. Bryson, Atty., Dept. of Justice, with whom Barry M. Hartman, Acting Asst. Atty. Gen., Martin W. Matzen, Atty., Dept. of Justice, and Marc Johnston, Atty., Dept. of Energy, were on the brief, for appellants in 91–5387, 92–5044, and 92–5045.

Tom Udall, Atty. Gen. of the State of N.M., with whom Manuel Tijerina, Michael Dickman, Lindsay A. Lovejoy, Jr., Frederic S. Nathan, Jr., Bernhardt K. Wruble, and John S. Moot for State of N.M. and Nancy Olinger for State of Tex. were on the joint brief, for appellees, State of N.M., et al. in 91–5387 and 92–5044. Renea Hicks for State of Tex. also entered an appearance for appellees.

Adam Babich, with whom Deborah S. Reames and Howard I. Fox for Sierra Club Legal Defense Fund and Dan W. Reicher for Natural Resources Defense Council were on the joint brief, for appellees Environmental Defense Fund, et al. in 91–5387, 92–5044, and 92–5045.

Before: MIKVA, Chief Judge, RUTH BADER GINSBURG and HENDERSON, Circuit Judges.

Opinion PER CURIAM.

PER CURIAM.

In these consolidated cases, the Departments of Energy and the Interior appeal from an injunction preliminarily granted on November 26, 1991 and made permanent on January 31, 1992, barring the implementation of Public Land Order 6826; issued in January 1991, Land Order 6826 provided for the deposit for test purposes of defense-related hazardous, radioactive waste in an experimental, underground New Mexico facility. We affirm the permanent injunction.

The dispute matured in October 1991, when the Department of Energy (DOE) received permission from the Department of the Interior (Interior) to begin transporting transuranic (TRU) waste[1] to DOE's Waste Isolation Pilot Plant (WIPP), a facility constructed on federal land in New Mexico. Congress had authorized WIPP's construction "for the express purpose of providing a research and development facility to demonstrate the safe disposal of radioactive wastes from defense activities." Pub.L. No. 96–164, 93 Stat. 1259, 1265 (1979). DOE sought to transport the TRU waste in order to conduct a test phase, which involved temporary burial of the hazardous, radioactive material in underground WIPP rooms.

New Mexico, joined by intervenors (the state of Texas, three members of Congress, and four environmental organizations), sued to restrain the transportation and deposit of the waste. The complainants argued primarily that, in proceeding to a test phase, DOE and Interior had failed to observe constraints Congress placed on administrative withdrawals of federal lands in the Federal Land Policy and Management Act of 1976 (FLPMA), 43 U.S.C. §§ 1701 et seq.[2] The environmental organization-intervenors in the FLPMA action also initiated a separate action, one month later, under the citizen suit provision of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6972(a)(1)(A). The citizen-suit plaintiffs alleged that DOE did not have a permit for the management of TRU waste at WIPP, as required by RCRA, id. § 6925(a), and that WIPP lacked "interim status," which would temporarily exempt the facility from RCRA's permit requirements. See id. § 6925(e); 40 C.F.R. § 270.

The district court, addressing only the FLPMA action, entered a preliminary injunction. Memorandum Decision Granting Preliminary Injunction, 783 F.Supp. 628 (D.D.C.1991), amended Dec. 13, 1991. Several weeks later, the court made the injunction permanent, this time granting summary judgment for the plaintiffs in the RCRA citizen suit and for the complainants on one of the FLPMA claims. Memorandum Decision Granting Permanent Injunction, 783 F.Supp. 633 (D.D.C.1992). The court ordered Interior to cease implementing Land Order 6826 and DOE to cease activities relating to the WIPP test phase to the extent those activities involved the introduction or transportation of TRU waste into the state of New Mexico.

## I. BACKGROUND

### A. FLPMA Provisions Governing Federal Land Withdrawal

WIPP is located on roughly 9000 acres of federal land administered by the Bureau of Land Management (BLM). FLPMA authorizes the Secretary of the Interior to "make, modify, extend, or revoke withdrawals [of federal land] but only in accordance with the [Act's] provisions and limitations." 43 U.S.C. § 1714(a). A withdrawal exempts the covered land from the operation of public land laws. Id. § 1702(j). Withdrawals of 5000 acres or more may be made "only for a period of not more than twenty years," subject to

1. The production of nuclear weapons yields "high-level" waste, which is characterized by intense heat and penetrating radiation, and "transuranic" (TRU) waste, which creates little heat and is generally less radioactive than high-level waste. TRU waste remains radioactive for very long periods of time; its isolation from the human environment is essential to protect the public health and safety.

2. The suit additionally alleged violations of various National Environmental Policy Act (NEPA) and Administrative Procedure Act (APA) prescriptions.

specified advance reporting by Interior to Congress, publication for notice and comment in the Federal Register, and, in the case of new withdrawals, opportunity for public hearing. *Id.* § 1714(b), (c) & (h). FLPMA preserves for Congress the legislature's power, under the Constitution, to dispose permanently of federal lands, *see* U.S. CONST. art. IV, § 3, cl. 2,[3] and it provides for congressional nullification, by concurrent resolution, of administrative withdrawals. *See* 43 U.S.C. § 1714(c)(1).

An administrative withdrawal of federal land may be extended "only if the Secretary determines that the purpose for which the withdrawal was first made requires the extension, and then only for a period no longer than the length of the original withdrawal." *Id.* § 1714(f). The Secretary must report all withdrawal extensions to House and Senate committees.

**B. Land Withdrawals for the WIPP Facility**

In 1982, Interior issued Public Land Order 6232 withdrawing the WIPP land for eight years "for the purpose of performing a Site and Preliminary Design Validation Program (SPDV) ... and to protect the lands pending a legislative withdrawal if appropriate." 47 Fed.Reg. 13,340 (Mar. 30, 1982).[4] In 1983, DOE sought a second withdrawal to construct WIPP. Interior obliged, issuing Public Land Order 6403 "for the purpose of the construction of full facilities for [WIPP] ... and to protect the lands pending a legislative withdrawal if appropriate." 48 Fed.Reg. 31,038 (July 6, 1983) (*1983 Land Order*). Valid through June 29, 1991, the order further provided that it did "not authorize the use or occupancy of the lands hereby withdrawn for the transportation, storage, or burial of

any radioactive materials." *Id.* The Secretary reported to Congress, in June 1983, confirming that "[t]he withdrawal authorizes the construction of the full WIPP facility but does not allow for disposal or experimentation with nuclear waste." The report explained:

DOE has not sought to obtain authority to dispose of or experiment with nuclear waste by an administrative withdrawal. This position has been maintained by DOE and BLM because of the statutory 20–year time limit imposed on administrative withdrawals in excess of 5,000 acres and the feeling that such a controversial long-term and significant land use commitment is most appropriately the responsibility of Congress.

Pursuant to these withdrawals, DOE sank two shafts to the repository level, excavated several rooms, and evaluated the reaction of the salt formations. Salt formations, it has been the operative assumption, should prove suitable for disposal of radioactive waste because their low permeability serves to prevent leakage and their plasticity in response to pressure allows fractures in the formations to heal themselves. The salt, it is anticipated, will gradually encase the waste deposited in the underground rooms ("salt creep"), isolating it from the accessible environment. The rooms, in effect, will collapse around the waste due to geologic pressure.

**C. DOE's Test Phase**

In 1985, EPA issued its "no migration" rules, which required DOE to be assured that, for 10,000 years, radiation escaping from a waste repository not exceed specified levels. *See* 42 U.S.C. § 10141(a); 40

3. The parties agree that the 1979 act authorizing the construction of the WIPP facility, *see supra* p. 1124, does not permanently withdraw the WIPP land.

4. Pursuant to NEPA, DOE had issued a Final Environmental Impact Statement (FEIS) in 1980 analyzing the consequences of proceeding with the WIPP project. The proposal examined called for excavation of several rooms about

2150 feet below ground in salt formations that had been generally stable for hundreds of millions of years, evaluation of the formations' ability to contain the waste, and, if results were satisfactory, permanent disposal. The FEIS considered three phases: the SPDV phase, construction, and disposal. A waste deposit test phase, following completion of construction and prior to the final disposal phase, was added later. *See infra* pp. 1125–26.

C.F.R. § 191.11–.18.[5] To satisfy the reasonable assurance requirement, DOE decided that a WIPP performance assessment was needed; gathering the necessary data, according to DOE, required a test phase, during which TRU waste would be placed in sealed bins in one of the excavated rooms. In 1987, DOE drafted a bill that would authorize the waste deposit testing, but Congress, to date, has not passed such legislation.[6]

Meanwhile, activity in the experimental SPDV rooms indicated that salt creep proceeds more rapidly than the FEIS had predicted. In addition to salt creep, fractures appeared. These fractures caused blocks or chunks of salt to fall to the floor, potentially blocking access to the rooms. In a 1990 supplement to the FEIS (SEIS), preparatory to proceeding to a test phase, DOE further studied the environmental consequences of the disposal (both temporary and permanent) of TRU waste in WIPP. DOE found that a disturbed rock zone develops around the excavated room, leading to fracture-producing stresses; DOE concluded, however, that the fractures would not overwhelm the beneficial effects of salt creep.

DOE regarded the fractures as "a short-term concern for personnel safety" that could be addressed by scaling down the walls of the rooms and installing rock bolts and wire mesh in the ceilings. The SEIS stated that during the test period, waste in the WIPP "must be readily and safely retrievable." Rock-bolting would enhance retrievability. DOE's Record of Decision described the test phase as "emplacing, in a fully retrievable manner, a limited quantity of TRU waste underground." 55 Fed.Reg. 25,692 (June 22, 1990).

**D. Modification and Extension of the *1983 Land Order***

In January 1989, DOE applied to BLM for a modification and extension of the *1983 Land Order* to facilitate the test phase. In its letter to Interior, DOE sought approval: (1) "to change the purpose of the land withdrawal ... to provide that the land is withdrawn 'for ... *the conducting of a test program by the DOE using radioactive waste at the site*'" (DOE's emphasis); (2) to delete the provision in the *1983 Land Order* prohibiting the transportation, storage or burial of radioactive material in connection with WIPP; and (3) to extend the withdrawal through June 1997.[7]

In August 1990, BLM, through its New Mexico state director, reviewed the SEIS and concluded that the test phase could be implemented. The Assistant Secretary agreed and issued Public Land Order 6826. 56 Fed.Reg. 3038 (Jan. 28, 1991). By its terms, Land Order 6826 "modifie[d] Public Land Order No. 6403 ... to (1) expand the stated purpose of the order to include conducting the test phase of the project using retrievable, transuranic radioactive nuclear waste at the site; (2) increase [DOE's] exclusive use area ...; (3) extend the term of the withdrawal through June 29, 1997 (the term of the ... withdrawal [then existing was] 8 years and [was] for construction of facilities) so as to provide sufficient time to

---

**5.** On judicial review, EPA's standards were vacated in part. *See Natural Resources Defense Council, Inc. v. EPA,* 824 F.2d 1258 (1st Cir. 1987). Pending post-remand action, DOE and New Mexico agreed that the agency would proceed as though the regulations were effective. *See* Brief for the Appellants at 8 n. 2.

**6.** A House bill, subsequently introduced, would have required DOE to demonstrate compliance with EPA standards for radioactive waste disposal prior to shipment of any waste to the site. *See also* Status of the Waste Isolation Plant Project, Hearings before a Subcommittee of the Committee on Government Operations, House of Representatives, 100th Cong., 2d Sess. (Sept. 13, 1988).

**7.** "Because of the significance of the WIPP project to the resolution of the radioactive waste disposal problem in this country," DOE stated that the agency "would prefer to have *Congressional* authority to use the public land to continue this important project." (DOE's emphasis.) DOE indicated its continued readiness to work with Congress on the appropriate bill, but sought the modification and extension "to allow the receipt at WIPP of radioactive waste for the demonstration phase in the event Congress does not act on the bill this year." Congress has not yet enacted the legislation. *See also supra* note 6 and accompanying text.

conduct the experimental test phase; and (4) delete paragraph 5 of Public Land Order No. 6403 which prohibits the use of the land for the transportation, storage, or burial of radioactive materials." Interior sent Congress the requisite report on the withdrawal extension.

Various Interior communications indicated that retrievability was a major concern.[8] The timing of retrieval and the length of the test phase were also examined. A June 1990 DOE memorandum indicated that the 1997 end-date requested in the modification and extension would be inadequate for the test phase and withdrawal; the memorandum stated that "a period of time several years longer will be needed to assure that waste retrieval could occur in time." In February 1991, shortly after the Land Order 6826 extension, DOE stated in a RCRA permit application that finding storage for the retrieved waste "could take up to eight years" after initiation of retrieval, and that retrieval would take more than three years from the date of the decision to retrieve. DOE also reported that some bins would not be loaded for tests until mid–1995, that bin tests last about five years, and that DOE had not determined the duration of further tests closely simulating the disposal phase configuration (alcove tests).

### E. Estimating the Life of the Test Phase Room

One of the rooms (SPDV 1) excavated during the SPDV phase in 1983 had experienced sporadic rock falls, followed by complete blockage in 1989. Lacking support installations such as rock bolts, the room was expected to collapse fully in the summer of 1990; it did so in February 1991, when a 1200–ton rock salt block fell to the floor.

The room to be used for the test phase (Room 1, Panel 1), excavated initially in 1986–87 and further in 1988, has dimensions identical to the collapsed SPDV 1. DOE originally anticipated that the room would be in use for other purposes for five years, after which it would be filled with TRU waste drums and sealed. DOE's decision to proceed first with bin-scale tests required that the room last for a significantly longer period. In April 1991 (a few months after the Land Order 6826 extension), DOE convened a Geotechnical Panel to assess the life of Room 1, Panel 1, and recommend measures for extending the life of the room to accommodate the bin-scale tests. The panel made various recommendations and suggested an engineering design evaluation to select the precise combination of modifications.

The design team concluded that the requisite support could be supplied by a system of rock bolts anchored with resin, with measuring devices attached to each bolt. In September 1991, DOE submitted the team's design to an independent Design Review Panel, which estimated that the design would provide a useful life "of at least seven years from the time at which the proposed [support system] is installed." The system is now in place.

### F. RCRA Treatment of TRU Waste and WIPP

RCRA comprehensively regulates, from generation to disposal, waste designated as hazardous. *See* 42 U.S.C. § 6921(a), (b); 40 C.F.R. Part 261. States may take primary responsibility for RCRA implementation by installing an EPA-approved hazardous waste management program. 42 U.S.C. § 6926(b). New Mexico's "base" program,

---

**8.** Briefing papers prepared for the Secretary of the Interior in February 1990 listed two of the "cons" in granting DOE's modification/extension. First, "[i]t would be difficult explaining to the public why [Interior] changed its 1983 policy on authorizing radioactive waste at the WIPP site. The basis for the policy was that authorization to proceed with the country's first permanent repository for radioactive waste would re- quire legislation." Second, absent legislation allowing permanent withdrawal, passed prior to June 1997, "DOE would probably request an extension of the withdrawal rather than retrieve the waste. Retrievability isn't realistic unless DOE determines that the site is unacceptable. Besides cost factors of retrievability, there would be much controversy and difficulty in finding a place to store this waste."

effective since January 1985, largely replicates the federal program.[9]

Facilities that treat, store, or dispose of hazardous waste must have a RCRA permit. *Id.* § 6925(a). Congress, when it passed RCRA, allowed existing facilities that deal with hazardous waste to continue operations, in "interim status," during the pendency of permit applications. As amended in 1980 and 1984, RCRA provides that facilities of two kinds may qualify for "interim status": (1) those "in existence" on November 19, 1980; and (2) those that become subject to the permit requirements because of RCRA statutory or regulatory changes adopted after the facility commences operations. *Id.* § 6925(e)(1)(A). Interim status requires the filing of a two-part application by certain dates. 40 C.F.R. §§ 270.10(e)(1), 270.73(d).

RCRA provides that its prescriptions shall not apply to substances and activities regulated under the Atomic Energy Act (AEA), 42 U.S.C. § 2011 *et seq.*, unless RCRA regulation is not inconsistent with the AEA. 42 U.S.C. § 6905(a). The radioactive materials in TRU waste are regulated under the AEA. The waste's hazardous components fall within RCRA's domain. The question arose whether TRU waste, in view of its compound character, was subject to regulation under both acts.

In a 1980 rulemaking, EPA stated its "mixture rule," which subjects to RCRA regulation any waste containing a mix of solid waste, as defined in RCRA, and substances listed as hazardous under RCRA. The RCRA definition of "solid waste" excludes "source, special nuclear, or byproduct material as defined by the [AEA]." *Id.* § 6903(27). In DOE's view, the first two materials (source and special nuclear) presented no definition problem (their definitions refer to specific substances, such as uranium, thorium, plutonium, enriched uranium), but the third (byproduct material) did. The AEA defines byproduct material as "any radioactive material (except special nuclear material) yielded in or made radioactive by exposure to the radiation incident

to the process of producing or utilizing special nuclear material." 42 U.S.C. § 2014(e). The waste stream from producing or utilizing special nuclear material may carry, in non-separable form, substances that both contain radioactive elements and are hazardous under RCRA. TRU waste fits that bill.

In 1985, DOE proposed to interpret "byproduct material" to include not only radioactive elements, but also any waste stream from the process of making special nuclear material, even if the stream included hazardous waste. 50 Fed.Reg. 45,736 (Nov. 1, 1985). DOE's proposed interpretation, had it become operative, would have removed TRU waste from RCRA regulation.

The next year, EPA published a notice on the extent to which state programs, to receive EPA approval, must assert authority over wastes contaminated with radiation. 51 Fed.Reg. 24,504 (July 3, 1986) (*1986 Notice*). EPA had not previously required state programs to regulate radioactive mixed wastes. In the notice, EPA announced its determination that RCRA applies to radioactive mixed wastes. DOE's final interpretation of the AEA "byproduct material" term, in contrast to DOE's proposed interpretation, is consistent with EPA's view. *DOE Final Rule*, 52 Fed. Reg. 15,937 (May 1, 1987) (stating that any waste stream containing both radioactive elements regulated by AEA and nonradioactive elements deemed hazardous under RCRA would be subject to both regulatory schemes, to the extent consistent with AEA).

In 1988, EPA issued another notice, this time addressing interim status for facilities like WIPP that handle radioactive mixed wastes. 53 Fed.Reg. 37,045 (Sept. 23, 1988) (*1988 Notice*). In states with base programs, EPA concluded that facilities treating only radioactive mixed waste (*i.e.*, no other hazardous waste) would not be subject to RCRA regulation until the state received the necessary supplemental authorization. The date of that authorization would count as the triggering regulatory

---

**9.** A base program reflects RCRA requirements prior to passage of the Hazardous and Solid

Waste Amendments of 1984, Pub.L. No. 98–616, 98 Stat. 3221 (1984). *See* 42 U.S.C. § 6926(g).

change for purposes of determining interim status.

The New Mexico legislature had previously excluded WIPP from the state's RCRA regulatory regime. N.M. STAT.ANN. § 74–4–3.2 (Supp.1988). This exception, which impeded the state from receiving EPA's authorization to regulate radioactive mixed waste, was repealed in February 1989. Effective July 1990, New Mexico received EPA's authorization to regulate such waste. The director of the New Mexico program then advised DOE of the permit filing requirements for the WIPP facility to qualify for interim status. DOE submitted the permit application forms within the deadlines set by New Mexico.[10]

### G. The District Court Decisions

In ruling on the preliminary injunction, the district court concluded that plaintiffs and intervenors would likely succeed on two of their FLPMA claims: first, that Interior had improperly modified and extended the 1983 withdrawal, in violation of FLPMA § 204(f), 43 U.S.C. § 1714(f); and second, that, in view of the uncertainty surrounding retrievability of the waste, any deposit of TRU waste could constitute a *de facto* permanent withdrawal of public land, in violation of FLPMA § 204(c)(1), 43 U.S.C. § 1714(c)(1). *Memorandum Decision Granting Preliminary Injunction* 783 F.Supp. at 630–32. Addressing other factors in the preliminary injunction equation, the court found that the risk of irretrievability of TRU waste indicated irreparable injury. *Id.* at 633. If the waste proved irretrievable, the court suggested, the decision reserved to Congress, whether to allow a permanent withdrawal of public land, would be preempted. *Id.* The court found no harm to third parties and a strong pub-

lic interest in issuing the injunction, *i.e.,* the injunction would preserve the legislature's constitutional prerogative to decide whether to withdraw public land permanently. *See id.* at 633.

Nor, in the district court's judgment, did DOE identify any counterbalancing factor making preliminary relief improper. The court rejected DOE's assertion of overriding public burden stemming from the agency's expenditures ("to date over one billion dollars have been spent on the WIPP project and an additional thirteen million dollars will be expended monthly in order to maintain the WIPP site"). "[I]t is uncontested," the court said, "that the same amount of money will be expended on the WIPP project regardless of whether the test phase goes forward." *Id.*[11]

In ruling on the permanent injunction, the district court addressed one FLPMA claim and one RCRA claim. First, the court held, the WIPP facility is not eligible for interim status under RCRA. *Memorandum Decision Granting Permanent Injunction* 783 F.Supp. at 636–38. Noting that DOE might proceed to introduce waste into WIPP after receiving a RCRA permit, the court also ruled on the FLPMA modification/extension issue. As to that claim, the court concluded that the 1989 land order allowing the test phase violated FLPMA. *Id.* at 638–39. In so ruling, the district court emphasized the prescription that withdrawal orders may be extended only when "the purpose for which the withdrawal was first made [so] requires." *Id.* at 638 (quoting 43 U.S.C. § 1714(f)). In terms substantially similar to those used in the preliminary injunction, the court permanently barred Interior from implementing Land Order 6826 to the extent it authorized the introduction of TRU waste into WIPP,

**10.** A year later, however, a new state director suggested that the trigger date for DOE's filings was the date New Mexico repealed WIPP's exemption. The state agency asked EPA to state "the legal standard EPA would use to determine whether WIPP has federal interim status." EPA responded that repeal of the state law was not a regulatory change under RCRA, because RCRA referred to changes under the Act; the relevant date for the WIPP facility would be the July 1990 EPA authorization for New Mexico's regu-

lation of radioactive mixed waste. New Mexico has not finally determined the applicable starting date for DOE's interim status filings.

**11.** Appellate counsel for DOE did not dispute New Mexico's assertion at oral argument that DOE is currently conducting tests at WIPP not involving deposit of radioactive waste, and that the ongoing activity would have taken place in any case.

and enjoined DOE from introducing or transporting the waste into New Mexico. *See supra* p. 1124.

We conclude that, although the district court's ruling on the RCRA claim must be reversed, that court's ultimate holding, that the Secretary of Interior exceeded his authority under FLPMA, is correct and justifies the relief ordered. We consider first the eligibility of the WIPP facility for interim status under RCRA, and then turn to the FLPMA claim and the relief ordered by the district court.

## II. INTERIM STATUS UNDER RCRA

■ RCRA gives "interim status" to hazardous waste treatment, storage, and disposal facilities that were in existence prior to November 19, 1980 (the effective date of RCRA) or the effective date of a "statutory or regulatory change" that first subjects the facility to RCRA's permit requirements, provided that the facility has met certain other requirements. *See* 42 U.S.C. § 6925(e). Interim status allows the facility to operate, without a permit, during the application process. As EPA has made clear, interim status is not granted by EPA; it is statutorily conferred. The agency's decision that a facility qualifies for interim status "is in essence a statement of opinion which reflects [EPA's] decision not to take enforcement action against the facility. Such a pronouncement does not ultimately dispose of the issue of whether the facility has interim status." EPA Guidance Memorandum re: Interim Status at 2–3 (quoted in *Memorandum Decision Granting Permanent Injunction* 783 F.Supp. at 637 n. 4).

The district court held that the WIPP facility did not have interim status under RCRA because it was not in existence prior to November 19, 1980 or a "statutory or regulatory change" that subjected the facility to RCRA regulation. The court pointed out that the radioactive mixed waste to be deposited at DOE's plant contains hazardous compounds such as carbon tetrachloride, mercury, and methyl alcohol that were regulated under RCRA long before the existence of the WIPP facility. *Memo-*

*randum Decision Granting Permanent Injunction* at 637–38. Using reasoning similar to that underlying EPA's "mixture rule," *see* 40 C.F.R. § 261.3(a)(2) (1991) (mixture of hazardous waste and other solid waste will be treated as hazardous waste under RCRA), *vacated and remanded, Shell Oil Co. v. EPA,* 950 F.2d 741 (D.C.Cir.1991), the court held that, because components of the radioactive mixed waste were subject to RCRA regulation before WIPP came into existence, the facility could not qualify for interim status. *Memorandum Decision Granting Permanent Injunction* at 638. The court further concluded that EPA's 1986 decision requiring state RCRA programs to regulate radioactive mixed wastes, *see supra* p. 1128, was not a "regulatory change," because it was not issued pursuant to the APA and, therefore, did not "create or change RCRA regulations." *See supra* p. 1127. In the court's view, the 1986 decision simply clarified that RCRA regulated mixtures of hazardous wastes.

■ In addressing DOE's challenge to the district court's ruling on the RCRA claim, we first must determine whether the RCRA statute itself clearly encompasses radioactive mixed wastes; for if it does, WIPP, which came into existence after RCRA was enacted, cannot qualify for interim status. Because we conclude that the statute is not crystalline on the coverage of radioactive mixed wastes, however, we next consider whether EPA's 1986 decision was a statutory or regulatory change, following which WIPP may qualify for interim status.

### A. Radioactive Mixed Wastes under RCRA

Section 1004(5) of RCRA defines "hazardous waste" as:

[A] *solid waste or combination of solid wastes,* which because of its quantity, concentration, or physical, chemical or infectious characteristics may—

(A) cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or

(B) pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed.

42 U.S.C. § 6903(5) (emphasis added). Section 1004(27) excludes from this definition of "solid waste" all "source, special nuclear, or byproduct material as defined by the Atomic Energy Act." *Id.* § 6903(27). By excluding AEA-covered source, special nuclear, and byproduct materials from the definition of solid wastes, RCRA exempts facilities handling that waste from its permit requirements. EPA correspondingly has excluded AEA-covered source, special nuclear, and byproduct materials from its definitional regulations listing RCRA-covered hazardous wastes. *See* 40 C.F.R. § 261.4(a)(4). But neither the statute nor the regulations specifically speak to radioactive wastes mixed with other wastes that are categorized as "hazardous" under RCRA. Similarly, section 1006(a) of RCRA, 42 U.S.C. § 6905(a), contemplates joint regulation under both RCRA and the AEA in certain circumstances, but does not indicate *how* Congress intended the two regulatory regimes to coexist. We can find, in short, nothing in the text of RCRA (or its legislative history) offering a clear indication that Congress intended the statute to regulate (or exclude from regulation) radioactive mixed wastes.

 Nor are we persuaded by the various arguments made by the RCRA citizen suit claimants in support of their contention that RCRA, from its inception, has covered these substances. The RCRA claimants first refer to DOE's own analysis of RCRA, contained in the Department's final rule defining "byproduct material," which concluded that RCRA was intended to regulate radioactive mixed wastes. *See DOE Final Rule,* 52 Fed.Reg. 15,937 (May 1, 1987). Based on DOE's full examination of RCRA and the statute's legislative history, the Department ultimately determined, in 1987, that Congress intended to "provide for the regulation under RCRA of all hazardous waste including waste that is also radioactive." *Id.* at 15,940. DOE noted that *Train v. Colorado Pub. Interest Re-*

*search Group,* 426 U.S. 1, 96 S.Ct. 1938, 48 L.Ed.2d 434 (1976), a case that had been recently decided at the time Congress was considering RCRA, resolved a similar issue under the Clean Water Act (CWA). The practical effect of this decision, according to DOE, was "a regime of concurrent regulation" by which EPA and the states were left free "to regulate, under the Water Act, the nonradioactive component of liquid effluents from nuclear facilities, while reserving to the Nuclear Regulatory Commission and DOE's predecessor agency all regulatory authority over the source, special nuclear and byproduct materials contained in those same effluent streams." *DOE Final Rule,* 52 Fed.Reg. at 15,939. DOE inferred that Congress "anticipated a similar result under RCRA." *Id.*

Because RCRA is not DOE's enabling statute, however, we need not defer to that Department's interpretation of RCRA, and we find several reasons to look elsewhere for guidance. We note initially that DOE viewed the issue differently in 1985; its proposed rule would have removed TRU waste from RCRA regulation. *See supra* p. 1128. Further, DOE's reliance in its final rule on *Train* seems questionable. Congress' use in RCRA of the same terms that the Court considered in *Train* (notably, the terms "source, special nuclear, or byproduct material") does not necessarily mean that Congress intended to incorporate the result of *Train.* If Congress had in fact wanted to incorporate *Train,* it had more explicit ways to do so. Most obviously, Congress could have referred to the case by name somewhere in the legislative history. As DOE acknowledged, there is no such reference. Second, *Train* dealt only with the question whether the term "pollutant," which, by statute, included "radioactive materials," also included source, special nuclear, or byproduct material when Congress had clearly regulated those nuclear wastes under the AEA. *Train* never specifically addressed "mixed" wastes (*i.e.,* source, special nuclear, or byproduct material mixed with wastes that would otherwise qualify as "pollutants" under the Clean Water Act). In short, nei-

ther DOE's analysis nor *Train* provides convincing argument that RCRA, inevitably and from the start, regulated radioactive mixed wastes.

The RCRA claimants also urge that the exemption for source, special nuclear, and byproduct materials is, in any case, essentially irrelevant. They assert that this exemption simply was not meant to affect RCRA regulation of radioactive mixed waste. Referring to another regulatory exemption excluding "domestic sewage" as well as "any mixture of domestic sewage and other wastes," the RCRA claimants point out that EPA explicitly excludes mixed wastes when it intends to do so. *See* 40 C.F.R. § 261.4(a)(1)(i), (ii). Even if we were to accept this argument, however, it addresses only EPA's regulation. The RCRA claimants show us nothing in the RCRA statute itself that addresses mixtures one way or another. EPA, however, the agency charged with RCRA's administration, has now definitively interpreted RCRA as covering these substances. *See* State Authorization to Regulate the Hazardous Components of Radioactive Mixed Wastes Under the Resource Conservation and Recovery Act, 51 Fed.Reg. 24,504 (July 3, 1986) (*1986 Notice*).

In view of the statute's ambiguity, we are committed to defer to EPA's reasonable interpretation. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). The question, then, is *when* did EPA first determine that RCRA covers radioactive mixed wastes?

B. Was the *1986 Notice* a Regulatory Change?

█ DOE asserts that EPA first issued a determination that radioactive mixed wastes were regulated by RCRA in its *1986 Notice.* The district court, however, appears to have concluded that EPA meant to regulate these mixed wastes under RCRA much earlier. In the district court's view, EPA's "derived from rule" (providing that solid waste derived from the treatment, storage, or disposal of a hazardous waste is a hazardous waste) and its "mixture rule"

(providing that a hazardous waste mixed with other solid wastes remains a hazardous waste) establish that mixed hazardous wastes were covered by RCRA since those rules were promulgated in 1980, long before the existence of WIPP. *Memorandum Decision Granting Permanent Injunction* at 9–10.

It is true that EPA has invariably applied its mixture rule to materials containing a combination of hazardous wastes, as defined by RCRA, and other solid and nonsolid wastes. *See* 40 C.F.R. § 261.-3(a)(2)(iv) (the mixture rule), *vacated and remanded, Shell Oil Co.,* 950 F.2d 741; *Chemical Waste Management, Inc. v. EPA,* 869 F.2d 1526, 1539 (D.C.Cir.1989) (upholding EPA's interpretation of its mixture rule to include mixtures of hazardous wastes and material *not* defined as a solid waste under RCRA, such as soil). But EPA has never specifically applied the mixture rule (or the derived from rule) to AEA-covered radioactive mixed wastes.

Furthermore, EPA itself recognized, in 1988, that its *1986 Notice* was "EPA's first official pronouncement to the general public that RCRA permitting requirements are applicable to radioactive mixed waste." Clarification of Interim Status Qualification Requirements for the Hazardous Components of Radioactive Mixed Waste, 53 Fed. Reg. 37,045, 37,046 (Sept. 23, 1988) (*1988 Notice*). Nor can the RCRA claimants identify any EPA decision prior to the *1986 Notice* interpreting RCRA to regulate radioactive mixed waste. Thus, it appears that the first time EPA definitively applied RCRA to this material was, indeed, in its *1986 Notice.* If the *1986 Notice* was a "regulatory change," therefore, WIPP may qualify for interim status.

The district court held that the *1986 Notice* was not a "regulatory change" because it was not issued pursuant to the APA and, therefore, "did not create or change RCRA regulations." *Memorandum Decision Granting Permanent Injunction* 783 F.Supp. at 637. We see nothing in RCRA, however, that defines a regulatory change in this manner. In fact, we

see nothing in the statute or its legislative history that defines a regulatory change at all.

The statutory provision allowing interim status qualification for facilities that were "in existence on the effective date of statutory or regulatory changes" became law in 1984. The legislative history surrounding the amendment is scant, but presumably Congress sought to allow facilities to continue operations, instead of forcing their immediate shut down, upon becoming subject to RCRA's permit requirements through a change in RCRA's regulatory scheme. An interpretation of "regulatory change" that included only formal amendments to the statute or its regulations would be inconsistent with such a fair notice and opportunity-to-adjust purpose.

Furthermore, EPA interpreted "regulatory change" in its *1988 Notice* to include changes other than formal amendments. Specifically, EPA regarded the *1986 Notice* as a "relevant regulatory change." The *1988 Notice* states:

> EPA believes that facilities in operation or under construction as radioactive mixed waste treatment, storage, or disposal facilities on July 3, 1986 may qualify for interim status under section 3005(e)(1)(A)(ii) of RCRA. The Agency interprets this provision as applying to such facilities in existence on July 3, 1986 because the July 3, 1986 notice was the first official pronouncement to the general public that RCRA permitting requirements are applicable to radioactive mixed waste. In view of the level of confusion surrounding regulation of radioactive mixed waste prior to that time, EPA will treat the July 3, 1986 notice as the relevant regulatory change for establishing that facilities in existence on that date may qualify for interim status if other applicable requirements are met.

53 Fed.Reg. at 37,046. The RCRA claimants argue that EPA's statement that it will "treat" the *1986 Notice* as a regulatory change was simply a "decision rooted in enforcement policy," not an interpretation of the RCRA statute. But neither the *1986*

*Notice* nor the *1988 Notice* limits EPA's decision to one of enforcement policy. In fact, the *1988 Notice* states that EPA *"interprets"* section 3005(e)(1)(A)(ii) as including the *1986 Notice*, because it was the first time EPA officially applied RCRA to radioactive mixed wastes. *See id.* (emphasis added). Because RCRA does not define the type of change that qualifies as a "regulatory change" under the statute, we defer to EPA's reasonable interpretation, and therefore reverse the district court's decision that WIPP was not eligible for interim status under RCRA. The precise date of the regulatory change for the WIPP facility is a matter the district court, because of the character of its analysis, did not reach, and we have no occasion to address that question. *See supra* note 10.

### III. FLPMA CLAIM

DOE makes two arguments in challenging the district court's holding that the modification and extension of the WIPP site withdrawal violated section 204 of FLPMA, 43 U.S.C. § 1714. First, DOE argues that Interior lawfully extended the withdrawal under subsection 204(f) because "the purpose for which the withdrawal was first made require[d] the extension." Brief for the Appellants at 41–43. In DOE's view, the 1983 withdrawal for the purpose of constructing the disposal facility necessarily included "testing and demonstrating the feasibility of radioactive waste disposal" at WIPP. *Id.* at 42. Second, DOE argues that Interior "properly modified the withdrawal to allow testing ... and then properly extended the withdrawal to continue the protection of the land." *Id.* at 43. In DOE's view, section 204 grants Interior broad discretion to modify a withdrawal. DOE further argues that because Congress did not define "modify" and because section 204 restricts Interior's modification power in limited instances only, Interior's interpretation is reasonable and entitled to deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).[12]

---

**12.** At oral argument, as we indicated *supra* note 3, counsel for appellants acknowledged that the

## A. Standard of Review

In evaluating Interior's construction of section 204, we follow the formulation set out in *Chevron*. First, we determine "whether Congress has directly spoken to the precise question at issue." *Id.* at 842, 104 S.Ct. at 2781. If so, we proceed no further, for courts "as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. at 2781. If not, we defer to Interior's construction of the statute so long as it is reasonable. *Id.* at 844, 104 S.Ct. at 2782.

## B. Statutory Framework

We restate here background introductorily set out in the opening section. *See supra* p. 1125. FLPMA section 204 grants Interior authority to withdraw lands from the operation of public land laws. Subsection 204(a) authorizes the Secretary of the Interior "to make, modify, extend, or revoke withdrawals but only in accordance with the provisions and limitations of this section." 43 U.S.C. § 1714(a). Subsection 204(c) provides the procedure for the withdrawal of a parcel of more than 5000 acres. This subsection requires that when such a withdrawal is made, "[t]he Secretary shall notify both Houses of Congress ... no later than its effective date." *Id.* § 1714(c)(1).[13] A withdrawal of over 5000 acres is also subject to a comprehensive reporting requirement. *See id.* § 1714(c)(2). The report must include, *inter alia,* "a clear explanation of the *proposed use* of the land involved which led to the withdrawal" and "an inventory and evaluation of the current natural resources uses and values of the site and adjacent public and nonpublic land and how it appears they will be affected by the proposed use, *including particularly aspects of use that might cause degradation of the envi-*

ronment." *Id.* § 1714(c)(2)(1) & (2) (emphasis added).

The only provision in section 204 that substantively limits Interior's authority to modify a withdrawal is subsection 204(j). It prohibits Interior from modifying three types of withdrawals: (1) those created by Act of Congress; (2) those creating national monuments; and (3) those adding lands to the National Wildlife Refuge System. *Id.* § 1714(j).

In contrast, subsection 204(f), which governs withdrawal extensions, is much more restrictive. It provides that "[a]ll withdrawals and extensions thereof ... having a specific period shall be reviewed by the Secretary toward the end of the withdrawal period and may be extended or further extended *only upon compliance with the provisions of subsection (c)(1)* ... of this section ... and only if the Secretary determines that *the purpose for which the withdrawal was first made requires the extension,* and then only for a period no longer than the length of the original withdrawal period." *Id.* § 1714(f) (emphasis added).

## C. Analysis

DOE's first contention is that extension was necessary to carry out the purpose for which the withdrawal was first made, that is, the construction of the disposal facility. According to DOE, construction necessarily includes "testing and demonstrating the feasibility of radioactive waste disposal." Brief for the Appellants at 42. This argument is refuted by the record. The 1983 land order authorizing the withdrawal expressly provides that the "order does not authorize the use or occupancy of the lands hereby withdrawn for the transportation, *storage, or burial of any radioactive materials,* except as to radiological instruments normally used for nondestructive testing and geophysical logging." Public Land Order 6403, para. 5, 48

1979 appropriations act authorizing DOE to "proceed with the Waste Isolation Project Plant construction project ... for the express purpose of providing a research and development facility to demonstrate the safe disposal of radioactive wastes," Pub.L. No. 96–164, 93 Stat. 1259, 1265–66, did not constitute a permanent with-

drawal for the purpose of storing radioactive wastes.

**13.** This section also provides for the disapproval of a withdrawal by concurrent resolution of Congress. *See* 43 U.S.C. § 1714(c)(1).

Fed.Reg. 31,038, 31,038–39 (July 6, 1983) (*1983 Land Order*) (emphasis added). Moreover, when DOE requested the withdrawal, it stated that "[t]he purpose for which the lands ... are to be reserved is to construct the WIPP R & D facility which is intended to demonstrate the safe disposal of defense radioactive wastes; however, *no radioactive waste will be stored or disposed of under the terms of this withdrawal.*" Letter from R.G. Romatowski, Department of Energy, to Charles Luscher, State Director, Bureau of Land Management, U.S. Department of the Interior, para. 7 (Jan. 10, 1983) (emphasis added).[14] These clear declarations of the limited purpose of the 1983 withdrawal manifest that the purpose did not include the storage of radioactive materials on even a trial basis. Accordingly, we reject this argument.

■ Alternatively, DOE argues that, because section 204 grants Interior broad discretion to modify a withdrawal, Interior acted lawfully when it modified the purpose of the withdrawal to include testing with radioactive wastes. This argument, however, does little to advance DOE's cause because the 1983 withdrawal was effective only until June 29, 1991. *See 1983 Land Order*, para. 6. Thus, even if Interior lawfully modified the 1983 withdrawal to allow for testing, an extension was required to continue testing past the June 29, 1991 expiration. Interior must have realized this because on January 29, 1991, it not only modified the original withdrawal but also extended it until June 29, 1997. *See* Modification of Public Land Order 6503, 56 Fed.Reg. 3038 (Jan. 28, 1991); *see also* Record of Decision (ROD), Waste Isolation Pilot Plant Project (WIPP), 56 Fed.Reg. 3114, 3114–15 (Jan. 28, 1991). Subsection 204(f), however, authorizes an extension "only if the Secretary determines that the *purpose for which the withdraw-*

*al was first made* requires the extension." 43 U.S.C. § 1714(f) (emphasis added). This language is clear—an extension is to be granted only to accomplish the purpose of the original withdrawal; it cannot be granted to accomplish the purpose of a modification.

DOE argues nonetheless that the extension was necessary "to continue the protection of the land" from the operation of the land laws. Brief for the Appellants at 43. But the same can be said of every withdrawal. If continued "protection of the land" were all it took to justify an extension, then Congress' restrictive prescription in subsection 204(f) would be reduced to insignificance. Indeed, DOE itself indicated a different understanding; its application for the extension cites the specific purpose of testing. Subsection 204(c)(2)'s reporting requirement further manifests that DOE misconstrues the subsection 204(f) instruction. That provision requires that the withdrawal report include "a clear explanation of the proposed use of the land." 43 U.S.C. § 1714(c)(2)(1). The report must also include "an inventory and evaluation of the current natural resources uses and values of the site ... and how it appears they will be affected by the proposed use, including particularly aspects of use that might cause degradation of the environment." *Id.* § 1714(c)(2)(2). Congress would hardly have required a report giving a "clear explanation of the proposed use" as well as aspects of the proposed use which "might cause degradation of the environment" if it did not intend that the purpose of a withdrawal encompass a proposed use far more specific than "protection of the land."

One can debate whether the purpose of a withdrawal includes the protection of the land from the operation of the land laws.

---

**14.** Also noteworthy is the December 7, 1982 letter of Garrey E. Carruthers, Assistant Secretary for Land and Water Resources, Department of the Interior, to Herman E. Roser, Assistant Secretary of Energy. The letter discussed the approval of the authorization to construct the WIPP facility. Paragraph four stated:

The new administrative withdrawal order will not authorize the use of the [WIPP] site for

the temporary placement or permanent burial of nuclear waste. The present intent of this Department is to provide land use authority, if appropriate, for a permanent facility within which defense-related nuclear waste may be placed, but the order will not authorize the use of the site for the actual placement or burial of nuclear waste.

Even so, subsection 204(c) manifests that the purpose of the withdrawal necessarily includes as well, or at least, the use to which the land will be put. Here, the original purpose of the withdrawal did not include the use of the WIPP site to store hazardous materials on even a temporary basis, a "use that might cause degradation of the environment." *See id.* § 1714(c)(2)(2). Indeed, the original purpose, as described by DOE, specifically excluded waste storage. Consequently, Interior has not met subsection 204(f)'s requirement that the extension be authorized only if "the purpose for which the withdrawal was first made requires the extension." *Id.* § 1714(f).

Our conclusion is further supported by comparing section 204's notification and reporting procedures for withdrawals with those for withdrawal extensions. When a withdrawal is initially authorized, the Secretary must notify both Houses of Congress of the withdrawal "no later than its effective date," *id.* § 1714(c)(1), and submit a report addressing the twelve issues set forth in subsection (c)(2). *See id.* § 1714(c)(2). When the Secretary extends a withdrawal, on the other hand, he must comply only with the notice provision of paragraph (c)(1). *See id.* § 1714(f). In our view, the different requirements are explained by subsection 204(f)'s demand that "the purpose for which the withdrawal was first made require[] the extension." *Id.* So long as the extension is granted for the original purpose, Congress does not need an additional report.

The reporting requirement is not just a formality. It is instead a fundamental part of the scheme by which Congress has reserved the right to disapprove administrative withdrawals. Unless a full report to Congress has been made at the time of withdrawal regarding the proposed use of the land and its effects, an extension is

unauthorized. An extension must be justified by reference to the original purpose of the withdrawal. The extension here was not confined to "the purpose for which the withdrawal was first made." *Id.* § 1714(f). Because Interior modified the purpose and extended the withdrawal of the WIPP site to include storage of radioactive waste without *ever* reporting to Congress on the effects of this use, the district court properly concluded that the extension violated FLPMA.[15]

## IV. RELIEF

We have affirmed the district court's ruling that DOE and Interior acted unlawfully in extending a withdrawal order for a purpose beyond that "for which the withdrawal was first made." *See* 43 U.S.C. § 1714(f). The purpose of the *1983 Land Order* was *to construct* the WIPP facility. That purpose cannot be stretched to include the temporary or permanent deposit of radioactive waste at the WIPP site.

The *1983 Land Order* left no doubt about its limitation. The order specifically did "not authorize the use ... of the [withdrawn] lands ... for the transportation, storage, or burial of any radioactive materials." Fully cognizant of the precisely confined authority under which the executive was operating, DOE's Secretary represented to Congress: "The withdrawal authorizes the construction of the full WIPP facility but does not allow for disposal or experimentation with nuclear waste."

■ DOE and Interior correctly observe that a federal court is obliged to fit each equitable remedy ordered to the nature of the violation found. *See* Reply Brief at 18; *cf. Weinberger v. Romero–Barcelo*, 456 U.S. 305, 313–19, 102 S.Ct. 1798, 1803–07, 72 L.Ed.2d 91 (1982) (*upholding* district court's exercise of discretion to grant relief short of an immediate cessation order

---

15. We recognize that Interior is not required to file a new report when it modifies a withdrawal. *See* 43 U.S.C. § 1714(c) & (j). Because the 1983 withdrawal was scheduled to expire before the planned completion of the test phase and an extension was therefore required, we are not confronted with the question whether Interior

has the power to modify a withdrawal by changing its purpose without reporting to Congress on the subsection 204(c)(2) issues. We note only the concern a responsible administrator will have to construe a statute as a harmonious whole.

where nature of violation and purpose of statute under consideration did not *require* a pause in challenged activity); *Amoco Production Co. v. Village of Gambell,* 480 U.S. 531, 541–46, 107 S.Ct. 1396, 1402–05, 94 L.Ed.2d 542 (1987) (similarly focusing on statute's underlying substantive policy in upholding district court's denial of preliminary injunction). The district court's permanent injunction here, however, meets the requirement that it match "the necessities of the particular case." *See Hecht Co. v. Bowles,* 321 U.S. 321, 329, 64 S.Ct. 587, 591, 88 L.Ed. 754 (1944). The injunction at issue simply holds DOE and Interior to the precisely limited permission they sought and received, and to the pledge to Congress they made—to construct a facility, but not to deposit waste until new authority so allows.

The Departments, heavily relying on *Romero–Barcelo,* 456 U.S. at 310, 102 S.Ct. at 1802, urge that the violation with which they are charged is merely "technical." We do not so regard their resort to a modification/extension escape from the more arduous course (legislation or, at least, a new administrative withdrawal order) Congress laid out. Congress declared in FLPMA:

> [I]t is the policy of the United States that—

> . . . . .

> (4) the Congress exercise its constitutional authority to withdraw or otherwise designate or dedicate Federal lands for specified purposes and that Congress delineate the extent to which the Executive may withdraw lands without legislative action.

43 U.S.C. § 1701(a)(4). By reducing, without right, the notice and opportunity for Congress to intervene, the agencies have not violated FLPMA in a trivial way. Rather, they have disregarded clear legislative directions on a matter fundamental to the Act. *Cf. Romero–Barcelo,* 456 U.S. at 314, 102 S.Ct. at 1804 (purpose and language of governing statute should inform district court's determination of appropriate remedy).

Congress retained for itself control over the use and disposition of federal land. The confinement of withdrawal order extensions to "the purpose for which the withdrawal was first made" is a prime means of securing that control. The stop order issued by the district court, accordingly, is a meet remedy in the circumstances this case presents.

The Departments have suggested no adequate substitute redress. Money damages, even assuming, *arguendo,* no government immunity bar, would not be responsive to the environmental and separation of powers concerns complainants raise. *Cf. Amoco Production Co.,* 480 U.S. at 545, 107 S.Ct. at 1404 ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration[.]"). Nor have DOE and Interior shown countervailing considerations that would justify leaving the complainants essentially remediless. DOE and Interior recite that "the progress of a project of critical national importance has been disrupted," and that "[m]illions of dollars ... have been lost as the facility stands ready to begin with the Test Phase but is unable to proceed because of the injunction." Brief for the Appellants at 74. As the Departments themselves acknowledge, however, *see id.* at 59, the permanent injunction merely bars them from taking an unauthorized shortcut. The district court's order does not inhibit activity at WIPP pursuant to a lawful administrative withdrawal or a congressional directive. Concerning unrecoverable costs, we have already noted that DOE is not simply marking time; it is currently conducting tests at WIPP, relating to assessment of the facility's performance, that do not involve the transportation or deposit of radioactive waste. *See supra* p. 1129 and note 11; *cf. Amoco Production Co.,* 480 U.S. at 545, 107 S.Ct. at 1404 ($70 million that oil companies had committed to exploration would be lost without chance of recovery if court granted injunctive relief).

■ DOE and Interior spend many pages attacking the district court's preliminary injunction memorandum opinion, be-

cause it dwelt on, and, according to the Departments, improperly evaluated the risk that radioactive waste, once deposited, might prove irretrievable.[16] We do not reach that issue, for it did not enter the permanent injunction calculus. The preliminary injunction, we hold, has been superseded by the permanent stop order. By its very nature, the preliminary ruling was a tentative order that persisted until, but not after, a definitive injunction was decreed. *See SEC v. First Financial Group of Texas*, 645 F.2d 429, 433 (5th Cir.1981); *Louisiana World Exposition, Inc. v. Loque*, 746 F.2d 1033, 1038 (5th Cir.1984).

### Conclusion

For the reasons stated, we reverse the district court's decision to the extent that it rules in favor of the plaintiffs in the RCRA citizen suit, but affirm that court's ultimate holding that the Secretary of the Interior exceeded his authority under FLPMA. We correspondingly affirm the district court's final order permanently enjoining DOE and Interior from proceeding with Public Land Order 6826 "insofar as [that order] authorize[s] the introduction of transuranic nuclear waste into ... the state of New Mexico."

*It is so ordered.*

---

**16.** DOE does not deny, however, that retrieval of test-deposited TRU waste would be difficult and time consuming, nor has DOE indicated where the waste would be stored once retrieved.